**STATE of Iowa, Appellee,**

v.

**David Anthony PETITHORY,
Appellant.**

No. 03–1679.

Supreme Court of Iowa.

Aug. 26, 2005.

Linda Del Gallo, State Appellate Defender, and Theresa R. Wilson, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, John P. Sarcone, County Attorney, and Jeffrey Noble and Frank Severino, Assistant County Attorneys, for appellee.

STREIT, Justice.

Parents can commit a crime by exposing their children to danger—even if the par-

ents themselves pose the danger. In this case, a baby girl lost her life because of her father's meth abuse; coming down from a high, he fell asleep while she sat in a running bathtub. The father, who was convicted of involuntary manslaughter, child endangerment, neglect of a dependent person, possession of a controlled substance, and domestic assault causing bodily injury, appeals his convictions. He claims his trial counsel was ineffective and the district court should have merged some of his sentences. We affirm.

## I. Facts and Prior Proceedings

On the night of February 12, 2003, Brooklin Petithory celebrated her first birthday with her three-year old sister, K.C., at the Chuck E. Cheese Restaurant in West Des Moines. That night, while Brooklin and K.C. slept, their parents, David Petithory and Amy Champoux, smoked methamphetamine together in the basement of the house the four shared. Both parents were chronic meth abusers.

High on meth, David Petithory stayed up late that night playing video games. He eventually came down from his meth binge and slept most of the next day while Champoux took care of the girls. Meth is a stimulant that often keeps addicts awake for long periods of time; inevitably, however, the body's need for sleep overcomes the effects of the drug and the addict "crashes" into a deep sleep from which it can be difficult to awake.

When Petithory awoke in the middle of the afternoon, Champoux told him she was going to run a few errands and asked him to give the girls a bath. Petithory put the girls in the bathtub, placing Brooklin in a tub chair.[1] Petithory turned on the water

and left. He fell asleep on a stairway outside the bathroom.

K.C.'s screams later dragged Petithory back to consciousness. He found Brooklin face down in the water. The tub was beginning to overflow. Tests later revealed the tub would have had to run for over eight minutes at full force to do so.

Brooklin was deprived of oxygen for between three and ten minutes. She sustained irreversible brain damage and died on March 23, 2003.

The State charged Petithory with a host of crimes, including involuntary manslaughter (two counts), child endangerment, neglect of a dependant person (three counts), and possession of a controlled substance (two counts). The State also charged Petithory with domestic abuse assault causing injury stemming from a previous altercation with Champoux. Following a bench trial, the district court convicted Petithory of all counts except for a count of involuntary manslaughter and a count of possession of a controlled substance. The court sentenced Petithory to twenty-seven years in prison.

Petithory appealed, and the court of appeals affirmed. In his application for further review, Petithory raises the same issues as he did before the court of appeals. First, he maintains the district court erred when it failed to merge his convictions for involuntary manslaughter, neglect, and child endangerment. *See* Iowa Code §§ 701.9 (2003) (merger statute), 707.5(1) (involuntary manslaughter by public offense), 726.3 (neglect of a dependant person), 726.6(1) (child endangerment). Second, he claims his trial counsel was ineffective because he failed to (1) make a specific motion for acquittal argu-

---

**1.** A tub chair makes it easier for an adult to bathe an infant, but is clearly not designed to replace adult supervision.

ing the State's evidence was insufficient to convict him on one of the counts of neglect, (2) object to a videotape showing Brooklin suffering in the hospital, or (3) move to suppress evidence obtained from a warrantless search of the home.

We granted further review to consider Petithory's first allegation of ineffective assistance of counsel, i.e., his claim that there was insufficient evidence to convict him on one of the counts of neglect. Specifically, Petithory maintains there is not substantial evidence to show he neglected K.C. in the months leading up to the bathtub incident.

## II. The Merits: Neglect of a Dependant Person

The district court convicted Petithory of neglecting K.C. from November 1, 2002 until February 13, 2003 because during that time he had "knowingly or recklessly expose[d] [her] to a hazard or danger against which [she could not] reasonably be expected to protect [her]self." Iowa Code § 726.3. The alleged hazard or danger was Champoux and Petithory himself—two "illegal drug using parents."[2] Although Petithory's trial counsel moved for a judgment of acquittal, Petithory contends his trial counsel was ineffective because he did not specifically argue in the motion that there was insufficient evidence to sustain his conviction.

### A. A Question of Sufficiency, Not Ineffectiveness

In truth, the question posed in this case is not whether Petithory's trial counsel was ineffective, but rather whether there was sufficient evidence to support his conviction. Unlike a jury trial, in a bench trial the defendant is *not* required to move

for a judgment of acquittal to preserve error on a sufficiency of the evidence claim. *See State v. Abbas*, 561 N.W.2d 72, 74 (Iowa 1997) (citing what is now Iowa R.Crim. P. 2.19(8)). The district court's finding of guilt necessarily includes a finding that the evidence was sufficient to sustain Petithory's conviction. *Id.* Petithory's trial counsel nonetheless made a motion for acquittal. The fact that he did not specifically point out alleged deficiencies in the sufficiency of the evidence cannot constitute ineffective assistance of counsel, because he was not required to make the motion in the first place.

■■■■ We decline the State's invitation, however, to rule adversely to Petithory on this basis alone. Properly framed, the question in this case is simply whether the evidence was sufficient to support Petithory's conviction. Our review, therefore, is not de novo, but for errors at law. *See, e.g., State v. Evans*, 671 N.W.2d 720, 724 (Iowa 2003) (reviewing sufficiency-of-the-evidence claim for errors at law); *State v. Shortridge*, 589 N.W.2d 76, 80 (Iowa Ct. App.1998) (same). We will uphold the district court's finding of guilt so long as there is substantial supporting evidence in the record. *State v. Spies*, 672 N.W.2d 792, 796 (Iowa 2003), *cert denied*, 541 U.S. 1089, 124 S.Ct. 2820, 159 L.Ed.2d 253 (2004). Evidence is substantial if a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt. *Id.* We are obliged to view the evidence in the light most favorable to the State, affording it all legitimate and reasonable assumptions that may be deduced from the evidence in the record. *Id.* That said, we consider not only the evidence that supports the verdict, but also that

---

**2.** The State filed separate neglect charges against Petithory for (1) repeatedly exposing Brooklin to drug addicts during the same period of time and (2) the act of putting K.C. in the tub unsupervised on February 13, 2003. These counts are not at issue here.

which detracts from it. *State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005).

**B. Leaving Your Kids With Meth Addicts Can Constitute Criminal Neglect**

■ Iowa's neglect statute makes it a crime for

[a] person ... having custody of a child ... who knowingly or recklessly exposes [the child] to a hazard or danger against which such person cannot reasonably be expected to protect [herself]. ...

Iowa Code § 726.3. It is not disputed that Petithory had custody of K.C. from November 1, 2002 to February 13, 2003. Only two elements of the neglect charge are at issue in this case: whether, on account of his and Champoux's meth abuse, during that same time frame Petithory (1) knowingly or recklessly (2) exposed K.C. to a hazard or danger against which she could not reasonably be expected to protect herself.

We conclude there is substantial evidence in the record to support the district court's findings that Petithory knowingly (or at least recklessly) exposed K.C. to a hazard or danger against which she could not reasonably be expected to protect herself. We consider the scienter and hazard/danger elements of the statute simultaneously because, as is often the case, a finder of fact may impute scienter to a defendant from the normal consequences of his actions. *See State v. Evans*, 672 N.W.2d 328, 331 (Iowa 2003); *State v. Chang*, 587 N.W.2d 459, 462 (Iowa 1998).

It is not disputed that Petithory used meth on a daily basis during the period alleged in the trial information. Petithory also regularly left himself alone with the children after Champoux left for work. When Champoux was home, she often used meth, too—as much as twice a week by her own account. These admissions are corroborated by methamphetamine residue and paraphernalia found in the house. It is abundantly clear from the record that during the alleged time frame Petithory repeatedly left his daughter, K.C., in the custody of meth addicts—whether in the person of himself or Champoux. This clearly posed an ongoing danger or hazard to the children.

Petithory stresses that there is no evidence K.C. had any meth in her system and disputes whether the girls ever had access to the drug. He maintains he was a careful drug abuser, smoking it only in the basement, where the children were not allowed. It remains, however, that both parents handled and consumed the illegal drug in the very house wherein the girls resided. The hazards the girls faced were not limited to the possibility of accidentally ingesting methamphetamine residue. Champoux testified Petithory became "mean" and "frustrated" when coming down from methamphetamine. Importantly, the State presented expert testimony which detailed—in intricate and comprehensive fashion—the dangers a parent's meth use poses to his custodial children. The State's expert witness testified:

Parents who are addicted to methamphetamine are not available ... to their children because under the influence of methamphetamine there is an initial high that an individual perceives and very soon after that high comes a downfall or a depression, which is much more severe with methamphetamine than other drugs of abuse. ... When that happens, many meth-using adults will fall asleep, and that period can last for hours at a time. In that period of time they're not capable of providing supervision and care for young children around the household.

Methamphetamine is a drug that ... stimulates the sensory nervous system and it also blocks the higher centers ... that are responsible for checks and balance of impulses. Perception of danger [and] reasoning ability ... are hindered from ongoing methamphetamine use. So that over a period of time an adult using methamphetamine loses [his] capacity to function on a daily basis because of lack of comprehension of what are the risks in the environment, what are children's needs on a day-to-day basis because they don't have the energy level to provide those needs. And also, because of the poor impulse control and increased risk of losing their temper and anger, the children in an environment where parents use meth are at increased risk of physical abuse.

K.C. faced these dangers every day while her parents used meth in the family home. The district court found:

As described by [the State's expert], the methamphetamine user is removed physically and emotionally from the household. Such detachment may not always result in sufficient hazards or risks to older children. However, in this court's opinion it is almost inevitable when coupled with the ongoing responsibility to care for children the ages of Brooklin and [K.C.].

. . . .

[Children] rely entirely on the care of responsible adults to protect them from the dangers the world has to offer. To his credit, it appears that the defendant did not directly expose the children to the direct toxic effects of his methamphetamine use. *However, he exposed them on a daily basis to the more subtle and more destructive effects of the drug.... [T]he changes in [Petithory's] behavior brought about from his methamphetamine use ... exposed them to a significantly greater risk of injury or death.*

(Emphasis added.) Moreover, the district court *explicitly* found Petithory knowingly or at least recklessly exposed K.C. to this danger. The court wrote:

The defendant is a chronic abuser of methamphetamine. He has learned through his years of use and treatment of the deleterious effects of methamphetamine. He was aware of how the drug changed him behaviorally and of the cycles of highs and lows described by the expert witnesses. He had specific discussion with Champoux regarding how the effects of methamphetamine were potentially harmful to their family.... His actions, both in continuing to use methamphetamine on a daily basis while in the household ... [was] clearly "knowing" for purposes of ... [the] neglect charges.

This conduct also satisfies the recklessness requirement of the neglect charges. Children of such tender years require a level of vigilance in those entrusted with their care that is simply not attainable in a person using methamphetamine to the degree that the defendant was over the time period in question in this case.

We conclude there is substantial evidence in the record to support the district court's findings. We have long recognized the dangers and hazards of leaving one's children in the custody of chronic drug abusers. *See, e.g., In re J.K.,* 495 N.W.2d 108, 113 (Iowa 1993) (finding that "parents [who] have severe chronic substance abuse problems" "clearly" presented a danger to their children). This danger is recognized daily in our juvenile courts, which are often forced to terminate the parental rights of those who are addicts precisely because their continued drug abuse poses a danger to their children. *See, e.g., id.* The dan-

ger is not any less or qualitatively different if the allegation is made in a criminal case. Meth affects a person even after the drug has left the person's body. The after-effects are pervasive and staggering—much more so than with other drugs such as alcohol or marijuana.

To rule otherwise in this case would countenance absurd results and be contrary to the common-sense manner in which we ought to interpret a statute. *See generally State v. Anderson,* 636 N.W.2d 26, 35 (Iowa 2001) (stating court interprets statutes to avoid an absurd result); *accord Harrington v. State,* 659 N.W.2d 509, 520 (Iowa 2003) (interpreting statute consistent with common sense). The dangers of leaving one's children in the custody of actively using methamphetamine addicts cannot be denied. No parent should leave his small children in the care of a meth addict—the hazards are too great. Experience sadly teaches us that any hope that no parent would leave his children in the care of a meth addict is misplaced; the law, however, sets a standard of conduct for parents and rightly mandates that no parent should do so.

Petithory rejoins that his conviction was based on mere *speculation* and *conjecture,* insofar as generalized risks are attributed to him without an affirmative showing such factors occurred in this case.[3] He also points to testimony of his friends and family members that he was a loving father. Whether he loved his children we are not called upon to decide; he exposed them to dangers and hazards, which is the statutory standard. Dangers and hazards need not be realized; dangers and hazards are by their very nature risks, not certainties. *Cf. Clinkscales v. Nelson Sec., Inc.,* 697 N.W.2d 836, 845 (Iowa 2005) (noting that

"[d]anger invites rescue" not only when the victim is actually injured, but where there is imminent risk of peril). Russian roulette is dangerous each time it is played, not just when someone has his head blown off. Although in this case danger was not realized until December 13, danger was present throughout the foregoing months, as well. Tragedy was waiting to happen.

As the trial court pointed out, the dangers posed to the children in the months prior to Brooklin's drowning were real. Neither the district court nor we need speculate to arrive at this conclusion. The particular constellation of facts present in this case is important. There is no question the defendant used meth on a daily basis; there is no debate about the pernicious effects of meth; there is specific testimony regarding Petithory's irate behavior whenever he "crashed" from a meth-induced high; and the children in Petithory's care were clearly of such a tender age that they could not be expected to protect themselves from the dangers and hazards to which he exposed them. This is not a case in which a parent is accused of using a less-potent drug once or twice and then caring for his teenage children; this is a parent of two very young children who left his children in the exclusive care of meth addicts for a period of months. What parent among us would entrust a three-year old to a meth addict? No right thinking parent would do so, because of the dangers and hazards. The law recognizes this common-sense notion and criminalizes those who subject their children to such peril.

Nor is Petithory's conviction based purely upon his *status* as an illegal drug user. A "status crime" is "[a] crime of which a

---

**3.** Petithory does *not* claim that the child neglect statute is unconstitutionally vague or overbroad.

person is guilty by being in a certain condition or of a specific character." *Black's Law Dictionary* 400 (8th ed. 2004). Petithory's conviction does not rest solely upon the fact that he is a drug abuser; it is that fact, plus his additional act of placing his children in his and Champoux's care while consuming and consumed by the drug, that is sufficient to support his conviction. It is one crime to possess methamphetamine; it is another crime to use methamphetamine and then try to supervise one's children or leave one's children in the care of an addict.

The defense would have it that only when the child has meth in her system does a parent expose the child to a danger or a hazard. The particular circumstances of this case, buttressed by expert testimony regarding the affects of meth addiction and its concomitant dangers, also fit within the statute's prohibitions. The effects of meth are felt long after the last hit has left the body. The trail of danger left by meth is often profound. *See State v. Bulington,* 802 N.E.2d 435, 440 (Ind.2004) (recognizing the dangers methamphetamine use poses—including "neglect by adults on a long, cheap high" (citation omitted)). A parent in this state is a danger, to which it is a crime to expose a defenseless child.

It does not matter that part of the danger to which Petithory exposed the children was himself. The statute forbids a parent from exposing a child to a danger; it does not distinguish among the sources of the dangers. For example, it is no different than a parent being charged with neglect for driving down the road, asleep, at a high rate of speed with a child. A parent who works seventy-two straight hours and then starts driving his children on the highways—sound asleep as he drives his trusting little treasures to their destruction—knowingly exposes a child to danger. As in the case at bar, the parent is the source of the danger. Even if the statute implicitly barred prosecutions of self-imposed dangers, however, this would not help Petithory. Here Petithory was charged in part for exposing K.C. to another danger, Champoux.

In sum, we conclude Petithory's sufficiency-of-the-evidence claim is without merit because substantial evidence supports his conviction. Petithory knowingly or at least recklessly exposed both girls to a danger against which they could not protect themselves—caretakers suffering from the effects and after-effects of drug abuse.

### III. Conclusion

There is sufficient evidence in the record to support Petithory's conviction of neglect of a dependant person. Finding no error in the district court judgment or the decision of the court of appeals, Petithory's convictions are affirmed on all counts.

**AFFIRMED.**